UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RALPH SEITZ,<br>    Plaintiff,<br>v.<br><br>J. C. PENNEY PROPERTIES, INC.;<br>J. C. PENNEY CORPORATION, INC.<br>    Defendants/Third-Party Plaintiffs,<br><br>v.<br><br>FOLSOM CONSTRUCTION LLC<br>    Third Party Defendant. | CASE NO. 3:15-cv-01131 (VAB) |

**RULING ON DEFENDANT J. C. PENNEY'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF'S COMPLAINT**

Ralph Seitz ("Plaintiff") brings this action against J. C. Penney Properties, Inc. and J. C. Penney Corporation, Inc. (collectively, "J. C. Penney"), alleging that J. C. Penney's negligence in maintaining a parking lot on its shipping facility in Manchester, Connecticut caused him to slip, fall, and sustain severe, painful, and permanent injuries. J. C. Penney has moved for summary judgment, alleging that it had no duty to Mr. Seitz at the time of his fall because a winter storm was ongoing. *See* J. C. Penney Mot. Summ. J., ECF No. 44.

For the reasons that follow, the motion is **DENIED**.

**I.   Factual Background**

J. C. Penney owns and maintains the Manchester Logistics Center ("the facility") in Manchester, Connecticut. J. C. Penney's Local Rule 56(a)(1) Stmt. ("J.C. Penney Stmt."), ECF No. 48, ¶ 1. At the facility, tractor-trailer trucks bring shipments of goods in and out of the Facility's warehouses and docks. *Id.* at ¶¶ 2-3.

1

In February 2014, Mr. Seitz worked for Schneider National, Inc., an independent contractor that provided trucking services to and from the Facility. *Id.* at ¶ 7. On February 18, 2014, during a winter storm, Mr. Seitz drove from his home in upstate New York to the Facility. *Id.* at ¶¶ 8-11. He planned to pick up a shipment of goods that he would take to various locations in New York. *Id.* at ¶ 17. At approximately 8:00 a.m. on February 18, after overnight temperatures had dipped as low as eight degrees Fahrenheit, snow began to fall in Manchester. *Id.* at ¶¶ 10. Mr. Seitz estimated that there was "probably an inch of snow on the ground" when he arrived in Connecticut, but that the snow "wasn't coming down real hard." Seitz Dep., Ex. 2 to J.C. Penney Stmt., ECF No. 48-2, 7:15-20.

Mr. Seitz arrived at the Facility at approximately 10:00 a.m. J.C. Penney Stmt. at ¶ 15. He learned from Schneider's office at the Facility that the shipment was not ready, *id.* at ¶ 18, and decided to have lunch while he waited, *id.* at ¶ 19. He left his truck to walk to a nearby restaurant. *Id.* at ¶ 20. After Mr. Seitz walked "25, 30 feet from the truck," his "feet just kicked out from under him." Seitz Dep. 140:4-5; *see also id.* at 149:1-7 ("Actually, my right leg kicked out and I just went flying, and I just landed hard on my left side."). Mr. Seitz stated that "when I landed, I thought I landed on pavement, and I - when I got up, I saw it was ice and not pavement." *Id.* at 140: 4-7.

He believed that he slipped on ice, and not snow, because "he didn't figure snow would be that slippery." *Id.* at 140:12-13. He agreed, however, that he never saw the ice that he slipped on and "wouldn't be able to describe what that ice was like." *Id.* at 140:12-20; *but see id.* at 149: 1-7 ("[W]hen my body landed, for the area that I cleared out with my body with the snow, it was ice underneath me."). After falling, Mr. Seitz lost consciousness for "a split second," felt dizzy, and "saw stars." Seitz Dep., 50:12-18. Afterwards, he returned to his truck and eventually fell

asleep in the bunk of the truck. J.C. Penney Stmt. ¶¶ 22-24. When he woke up several hours later, he was unable to move his truck because of the snow that had accumulated. *Id.*

Mr. Seitz visited three medical providers after the accident and told all of them that he had sustained injuries after slipping on ice. Pl.'s Stmt. Disp. Facts, ¶¶ 2-4; *see also* Exs. 2-4 to Serrano Decl., Ex. 1 to Pl.'s L.R. 56(a) Stmt., ECF No. 52-3 (report of Brittany Hausman, PA); 52-4 (report of John Cambareri, MD), 52-5 (initial evaluation report from Matthew Brown, PT). Mr. Seitz had visited the Facility several days before his accident. Seitz Dep., 20:12-24.[1] He stated that he did not "recall" the weather conditions on that date. *Id.*

J.C. Penney submitted a report from Robert B. Cox, a meteorologist, as an exhibit to its motion for summary judgment. *See* Decl. of Robert Cox, Ex. 6 to Def.'s L.R. 56(a) Stmt., ECF No. 48-6 ("Cox Decl."). In his report, Mr. Cox summarized the weather conditions and accumulated precipitation during the week of Mr. Seitz's accident. *Id.* at p. 4-5. Mr. Cox concluded that snow began falling in Manchester during the predawn hours of February 13, 2014 [and] continued beyond midnight (the start of February 14th) and fell mainly in the form of snow after about 2:30 a.m.-3:00 a.m. on the 14th, [resulting in t]otal snow accumulation in Manchester [of] about 9.0"-10.0"." Cox Letter, Ex. 6 to Def.'s L.R. 56(a) Stmt., ECF No. 48-6, 4-5. Folsom Construction, a contractor for J.C. Penney and third-party Defendant in this case, submitted invoices to J.C. Penney indicating that it had cleared snow and spread salt at the premises from 5. a.m. until 12 noon on February 13th. Invoice No. 28123, Ex. 12 to Def.'s L.R. 56(a) Stmt. ECF No. 48-12.

---

[1] Mr. Seitz argues in opposition to summary judgment that this estimation was incorrect because it was "based on the erroneous assumption that February 18 was a Thursday," and that he actually visited the Facility on the Thursday before his accident, on February 13, 2014. *See* Opp. Mem. at 7.

3

Snow began to fall again during the afternoon of February 15, and an inch of snow had accumulated before the snowfall "tapered off" by 11:00 p.m. Cox Letter, p. 4. Folsom Construction performed snow plowing and salting services after that accumulation, between 3:00 a.m. and 9:00 a.m. on February 16th. *Id.* No snow fell on February 17th, when the high temperature reached 32 degrees. *Id.* Mr. Cox estimated that "snow depth on untreated, undisturbed ground surfaces was about 15.0"-16.0" on February 17th." *Id.* During the night of February 17th, the temperature dropped to six degrees. *Id.* Snow began falling again between 8 a.m. and 3:30 p.m. on February 18th, resulting in two to two and a half inches of additional accumulation. *Id.*

In 2011, J.C. Penney entered into a contract with Folsom "to perform snow removal and salting" at the Facility. J.C. Penney Stmt., ¶ 5; *see also* Contract, Ex. 5 to J.C. Penney Stmt., ECF No. 48-5. Laura Briggs, who was the Office Manager for Folsom from 2006 until it closed for business in December 2014, explained that when Folsom was required to do work at a location, "the foreman on-site . . . would insure that it was done." Briggs Dep., Ex. 3 to J.C. Penney's Stmt., ECF No. 48-3, 100: 2-6. The foreman would not produce a report of the work that was completed. *Id.* at 100:11-12. Ms. Briggs also stated that she had no way to determine, from the documents in her possession, "whether snow was removed from any particular lot" or whether a particular lot was salted on a particular day. *Id.* at 100:13-21.

J.C. Penney's Contract with Folsom provided that Folsom would apply "the appropriate ice melt product . . . based on current and forecasted conditions." Contract, 4.2. It added that

> Generally, pure salt is considered effective down to 20 degrees. Ice melt products formulated to be effective in temperatures below 20 degrees, such as magnesium chloride, will be applied to maintain safe driving and walking conditions as needed.

4

*Id.* Despite this contractual language, Ms. Briggs stated that Folsom used "straight salt" at the Facility during the 2013/2014 season. Briggs Dep. 48:3-5. Ms. Briggs stated that she did not "believe . . . that [Folsom] purchased treated salt" for J.C. Penney and that the decision to purchase treated salt would have been made by J.C. Penney. *Id.* at 48:5. In the five days before Mr. Seitz's fall, Folsom billed J. C. Penney for four "hoppers" of "complete salting applications," on February 13th, 14th, and 16th. *See* Invoice No. 28123, Ex. 12 to J. C. Penney Stmt., ECF No. 48-6. According to Ms. Briggs, based on the price Folsom charged, these "hoppers" would have contained "pure," rather than treated, salt. Briggs Dep. 47:13-24 ("Q: And you're able to discern from that invoice that this was a treated salt application?/ A No, it was not./ Q So, it's the cheaper of the two applications?/ A Yes. Q And taking your attention back to the contract provision that we just looked at the note saying 'using straight salt or treated salt would be based on the temperature forecast.' What was your understanding, if any, about how the temperature forecast affected whether straight salt or treated salt was used?/ A I don't believe in the 2013/2014 season that we purchased treated salt and that would have been a decision by J.C. Penney.").

Ms. Briggs also stated that J.C. Penney specified that Folsom only use salt, rather than sand, at the Facility. Briggs Dep., 101:15-22. By contrast, Folsom used sand to treat the surfaces at the facilities of its other customers in Manchester, Connecticut. *Id.* at 101:1-14. Generally, Folsom would apply salt to a location, even if it was not snowing, "because of freezing temperatures," since "residual snow melt that thaws during the day[] freezes back up at night." *Id.* at 102: 23-24.

In February 2014, Robert Gardner served as J.C. Penney's "Maintenance Senior Manger" at the Facility. Gardner Dep., Ex. 1 to J.C. Penney Stmt., ECF No. 48-1. At the time of

5

the incident, Mr. Gardner was "responsible for the [F]acility and the grounds" and managed a "crew of maintenance workers." *Id.* at 7:1-11. J.C. Penney asked Mr. Gardner and his team to "inspect[] the entire property" at various points, although they did not make "routine inspections." *Id.* at 21:13-18. Mr. Gardner stated that J.C. Penney employees did not keep "any log . . . regarding the parking lot inspections" or the "snow treatment or ice treatment or clearing work" in the Facility. *Id.* at 22: 16-24.

Mr. Gardner also explained that "[t]he typical method of snow removal [wa]s to push the snow into a pile over to one side [of the Facility] or the other." *Id.* at 64:15-16. The "piles could be removed if they become large enough that they were creating a problem," but Mr. Gardner did not recall moving snow piles from the facility in February 2014, meaning "the piles weren't big enough that they were causing a problem in that regard." *Id.* at 64:25-65:1.

Mr. Seitz has a workers' compensation case pending against his employer, Schneider National, Inc. As of December 2, 2016, he has been paid $73,530.95 and had $33,719.29 paid in medical bills on his behalf. Pl.'s L.R. 56(a)(2) Stmt. ¶ 29.

## II. Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact remain in dispute and that it is thus "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" and a factual issue is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the record, this Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary*

*Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citations omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is inappropriate. *See Security Insurance Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Anderson*, 477 U.S. at 250 (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict"). In determining whether summary judgment is appropriate, the Court must consider only admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] ... may rely only on admissible evidence") (citation and internal quotation marks omitted); FED. R. CIV. P. 56(e).

### III. Discussion

J.C. Penney argues that summary judgment is appropriate because, under the so-called "ongoing-storm doctrine," it did not owe Mr. Seitz a duty of care to clear snow and ice from the Facility, while the winter storm was in progress. Defs Mem. at 1. Mr. Seitz responds that "conflicting evidence exists as to whether [he] fell due to pre-existing ice or due to the snow being deposited on the ground during the ongoing storm," making summary judgment inappropriate. Opp. Mem., ECF No. 52, 6. The Court agrees with Mr. Seitz.

"In the absence of unusual circumstances, a property owner, in fulfilling the duty owed to invitees upon his property to exercise reasonable diligence in removing dangerous accumulations of snow and ice, may await the end of a storm and a reasonable time thereafter before removing ice and snow from outside walks and steps." *Kraus v. Newton*, 211 Conn. 191, 197-98 (Conn. 1989). To do otherwise, the Connecticut Supreme Court has observed, would be "inexpedient and impractical." *Id.*

The ongoing storm doctrine is inapplicable when an invitee's injury stems from a "preexisting dangerous condition upon the defendant's premises," including preexisting ice or snow, rather than the ongoing storm. *Kraus*, 211 Conn. at 198. In such a case, a property owner may still owe a duty to an invitee to clear the preexisting ice and snow. Questions of "whether a storm has ended or whether a plaintiff's injury has resulted from new ice or old ice when the effects of separate storms begin to converge" are factual issues that can be determined by a jury. *Id.* at 197-98; *see also Nash v. Arc Enterprises*, LLC, 2015 WL 1867154, at *2 (Conn. Super. 2015) ("The *Kraus* case . . . does not contemplate the accumulation of ice or snow already on the property before the ongoing storm.").

Both parties cite *Berlinger v. Kudej*, where the Appellate Court reversed a trial court decision granting the defendant's motion for summary judgment under the ongoing storm doctrine. 120 Conn. App. 432 (2010). In *Berlinger*, the court denied summary judgment because a genuine issue of material fact remained about "whether the driveway contained an icy accumulation prior to the morning" of the plaintiff's fall. *Id.*, at 436. The court relied on the plaintiff's affidavit, in which he stated that he believed the ice was from a prior precipitation rather than the ongoing storm, and the plaintiff's deposition testimony, in which he stated "that he had observed isolated patches of ice on the driveway on the Friday prior to his December 9, 2005 fall" and "detailed his observations of the patch of ice on which he fell," which was "under the snow" that was on the driveway. *Id.* at 435.

Similarly, in *Dominguez*, the court denied defendant's motion for summary judgment because the record did not conclusively establish that the plaintiff's injuries were caused by the ongoing storm. *Dominguez v. U.S.*, 963 F.Supp.2d 107, 117–18 (D. Conn. 2013). Specifically, the plaintiff had stated that "[e]veryone was talking" about the fact that the snow hadn't been

cleared" even before she was injured during a new storm. *Id.* Additionally, the weather report for the days preceding the incident reflected a "range in temperature and decline in the total snow and/or ice present on the ground," indicating "that some melting could have occurred on January 7, and such melted ice or snow could have refrozen by [the date of the accident], when temperatures dropped back to between 17 and 34 degrees Fahrenheit." *Id*; *see also Bundy v. Ryefield II, Ass'n., Inc.*, 2008 WL 642681, at *2 (Conn. Super. Ct. 2008) (summary judgment denied when the plaintiff "testified that when his fall occurred[,] it was not precipitating, and that it had stopped precipitating during the night there, and that on the morning of the accident, his walkway had already been shoveled, but there was still ice on the landing that caused him to slip and fall down the stairs."); *Bok-Lopez v. Ceruzzi Properties, LLC*, 2012 WL 1221407, at *3 (Conn. Super. Ct. 2012) (denying summary judgment when the plaintiff's deposition transcript did not describe the "actual condition that caused the plaintiff's fall" and "the defendant has not submitted any evidence to show that the parking lot had been clear of snow and ice prior to the storm . . . .").

At the same time, a plaintiff cannot defeat a summary judgment motion with an "unsupported" argument that she slipped on preexisting ice during an ongoing storm. *Dancy v. Waterbury Housing Authority*, 2016 WL 402257, at *3 (Conn. Super. Ct. 2016). In *Dancy*, the Superior Court granted summary judgment to the defendant based on the ongoing storm doctrine, rejecting the plaintiff's argument that she had slipped on old ice from a prior storm. *Id.* The plaintiff's argument was "unsupported by personal knowledge, such as prior observation of the presence of ice at the place where she fell." *Id.* Additionally, the court rejected the plaintiff's contention that "weather temperatures below freezing could have allowed for old ice to form at the location," because "the jury would have to engage in impermissible speculation in order to

9

make a factual finding that there was old ice at the location, which remained there after the defendant's snow removal work." *Id.*; *see also Barile v. Edison House, LLC*, 2003 WL 22786284, at *2 (Conn. Super. Ct. 2003) (summary judgment granted under the ongoing storm doctrine when the plaintiff did not "offer any credible evidence by way of deposition testimony, sworn affidavit or other acceptable source that the ice that caused her to fall was the result of a winter weather event that occurred prior to the . . . event that was ongoing when she fell."); *but see Briley v. Dolce/AEW Investments No. 1, LLC*, 2007 WL 4171577, at *3 (Conn. Super. 2007) (when the plaintiff submitted an affidavit stating that he fell on 'old ice,' the defendants could not invoke the ongoing storm doctrine because "although they have put forth uncontradicted evidence that it was snowing at the time of [the] plaintiff's injury, they have failed to provide evidence that shows there was no 'old ice' on its property at that time.").

According to J.C. Penney, Mr. Seitz's contention that he slipped on old ice asks "the jury to engage in pure guesswork." Reply at 6. Unlike the plaintiffs in *Dominguez* and *Berlinger*, J.C. Penney contends, Mr. Seitz does not submit eyewitness testimony or other proof of preexisting ice. *Id.* at 7. Mr. Seitz does not present evidence that other people noticed old ice at the Facility on the date of the incident, *Dominguez*, 963 F.Supp.2d at 117, and does not conclusively state that he saw ice at the Facility before the February 18 storm, *Berlinger*, 120 Conn. App. at 435. The Court disagrees.

The record does suggest that a snow storm was ongoing when Mr. Seitz fell, and Mr. Seitz himself estimated that there was "probably an inch of snow on the ground" when he arrived in Connecticut, and stated that the snow "wasn't coming down real hard." Seitz Dep. 7:15-20. Mr. Seitz, however, suggests that he fell on ice located under the snow. He says that there was snow on the surface of the parking lot, Seitz Dep., 139:25, but he landed on ice underneath:

10

"And when I landed, I thought I landed on pavement, and I— when I got up, I saw it was ice and not pavement." Seitz Dep., 140:6-7. He substantiates this claim by offering contemporaneous medical records in which he concludes that he slipped on ice that was under the snow, rather than snow itself. His testimony suggests that the lot was not uniformly icy, because he did not "notice it to be slippery" until he fell, suggesting that the ongoing storm was not causing ice to form at the Facility. Seitz Dep., 48:1-13.

Connecticut courts have consistently denied summary judgment in similar settings, holding that a plaintiff who claims they fell on ice underneath a layer of fresh snow had raised an issue of material fact. *See, e.g.*, *Bok-Lopez*, 2012 WL 1221407 at *3 (finding genuine issue of material fact remained where plaintiff and third-party had alleged there was "snow over a layer of ice underneath."); *Brooks v. Sal-War, Inc.*, 2016 WL 7137628, at *3 (Conn. Super. Ct. 2016) ("First, there is a genuine issue of material fact in dispute as to whether the plaintiff fell on new snow or old ice. Though the plaintiff admits in her affidavit that it was snowing earlier in the day and also when she exited the store at 5 p.m., she states that she slipped on old ice underneath that fresh snow and that there was no sand or other abrasive material on the ice."); *Charles v. Kennedy*, 2015 WL 3521678 at *3 (Conn. Super. Ct. May 7, 2015) ("Her statement that there was ice underneath newly fallen snow, creates a material issue of fact as to whether the slippery condition was caused by a previous storm.").

Mr. Seitz's contention that it was old ice—and thus a dispute that would be properly resolved by the trier of fact—is also supported by the weather report. The report indicates that ice may have formed at the facility before Mr. Seitz's fall. While J.C. Penney argues that "in the five days preceding [Mr. Seitz's] alleged fall, [Folsom] completed four applications of so-called 'treated' salt," Ms. Briggs stated that Folsom used only "straight salt" at the Facility during the

2013/2014 season. *See* Reply at 6. J. C. Penney's own records make clear that "straight salt" melts ice when the outside temperature is above 20 degrees, and that "treated" salt is preferred for lower temperatures. *See* Contract, 4.2. From this data, a jury could conclude that Mr. Seitz slipped on ice that had accumulated from earlier snowstorms, or on water or snow—including from snow piles on the property, that had turned into ice when the temperature dipped below ten degrees during the night of February 17th. *See* Cox Letter, 5; *Dominguez*, 963 F.Supp.2d at 117-18 (noting that the weather report for the days preceding the incident reflected a "range in temperature and decline in the total snow and/or ice present on the ground," indicating "such melted ice or snow could have refrozen by [the date of the accident].").

Furthermore, neither party offers clear evidence suggesting whether or not the Facility was clear of ice and snow before the February 18th snowfall. While Mr. Seitz cannot state for certain the "actual condition that caused the plaintiff's fall," *Bok-Lopez*, 2012 WL 1221407 at *3, the defendant has not put forth evidence suggesting that "the parking lot had been clear of snow and ice prior to the storm." *Id.* Unlike *Dancy*, where defendant's property manager specifically stated that the area had been cleared of ice and snow before the storm, the record contains no information from Folsom or J. C. Penney employees indicating that the Facility was cleared. *Dancy*, 2016 WL 402257, at *1 (reviewing affidavit from property manager "aver[ring] that snow removal work occurred at [the property], including the sidewalk," on the days before the storm).

There remains therefore a dispute about a genuine issue of material fact: whether Mr. Seitz slipped on old or new ice, an issue reserved for resolution by a jury.

## IV. Conclusion

Defendant's motion for summary judgment is DENIED.

SO ORDERED at Bridgeport, Connecticut this 28th day of September, 2017.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT
JUDGE