# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| RALPH SEITZ,<br>    Plaintiff,<br>v.<br><br>J. C. PENNEY PROPERTIES, INC.;<br>J. C. PENNEY CORPORATION, INC.<br>    Defendants/Third-Party Plaintiffs,<br><br>v.<br><br>FOLSOM CONSTRUCTION LLC<br>    Third Party Defendant. | CASE NO. 3:15-cv-01131 (VAB) |

## RULING ON THIRD PARTY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND THIRD PARTY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

J. C. Penney Properties, Inc. and J. C. Penney Corporation, Inc. (collectively, "J. C. Penney"), Defendants in a lawsuit from Ralph Seitz arising from a fall that occurred during a winter storm on J. C. Penney's property, filed a third-party Complaint against Folsom Construction, LLC ("Folsom"). *See* Third-Party Complaint, ECF No. 23 ("Compl."). J. C. Penney alleged that Folsom was liable for (1) contractual indemnification, (2) promissory estoppel, and (3) common law indemnification. *Id.* Before the Court is J. C. Penney's motion for summary judgment on Count One of the third-party complaint, as well as Folsom's motion for summary judgment on the remaining two counts. *See* J. C. Penney Mot. ECF No. 46; Folsom Mot., ECF No. 43.

For the reasons that follow, both the third-party plaintiff's motion for summary judgment and the third-party defendant's motion for summary judgment are **DENIED**.

## I. Factual Background[1]

J. C. Penney owns and maintains the Manchester Logistics Center ("the facility") in Manchester, Connecticut. J. C. Penney's Local Rule 56(a)(1) Statement ("J. C. Penney Stmt."), ECF No. 49, ¶ 1; Folsom's Local Rule 56(a)(1) Statement ("Folsom Stmt."), ECF No. 42-2, ¶ 3. At the facility, tractor-trailer trucks bring shipments of goods in and out of the Facility's warehouses and docks. *Id.* at ¶¶ 2-3. On February 18, 2014, during a winter storm, Ralph Seitz drove from his home in upstate New York to the Facility. *Id.* at ¶ 10-11. Mr. Seitz, who worked as an independent contractor for Schneider National, Inc., planned to pick up a shipment of goods that he would take to various locations in New York. *Id.* at ¶ 19. At the Facility, he left his car to take a mandatory lunch break and slipped and fell, experiencing injuries that, by December 2016, required $107,243.24 of care, which he was paid by Workmen's Compensation. *Id.* at 22-24. In June 2015, Mr. Seitz filed his Complaint against J. C. Penney, alleging that J. C. Penney's negligence proximately caused his injuries. *Id.* at ¶ 25.

In 2011, J. C. Penney entered into a contract with Folsom under which Folsom was responsible for clearing and treating all the parking areas and the perimeter roadway. *Id.* at ¶ 6; *see also* Contract, Ex. 5 to J. C. Penney's Stmt., ECF No. 49-5, at Sch. A, Art. 4-5 (hereinafter "Contract"). The Contract required Folsom to provide J. C. Penney a defense and indemnity for

---

[1] The following facts are taken from the parties' Local Rule 56(a)(1) statements, *see* J. C. Penney L.R. 56(a)(1) Stmt., ECF No. 49; Folsom L. R. 56(a)(1) Stmt., ECF no. 42-2, and the exhibits attached to them. The supported facts in J. C. Penney's Statement are deemed admitted because Folsom has failed to file a Local Rule 56(a)(2) statement. Folsom's Statement is controverted by J. C. Penney's submission under local rule 56(a)(2). *See* ECF No. 51; *see also* D. Conn. L. Civ. R. 56(a)(1) ("All material facts set forth in [the moving party's Local Rule 56(a)] [S]tatement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a) 2.").

"any and all claims arising out of or related to Folsom's clean-up activities." Contract, Art. 9.

Specifically, the Contract provided that:

> [Folsom] agrees to defend and indemnify J. C. Penney and its current and former directors, officers, agents, employees and affiliates from and against any and all claims and legal proceedings made or brought by third parties (Including, without limitation, governmental entites aid current or former directors, officers, agents, employees and affiliates of Contractor) that in any manner arise out of, relate to, or are caused by Contractor's performance or non-performance of this Agreement. . . . [I]f a legal proceeding subject to this indemnity provision is brought against J. C. Penney or any of its current and former directors, officers, agents, employees and affiliates. Contractor will retain and pay reputable counsel, approved by J. C. Penney, to represent J. C. Penney.

Contract, Art. 9.1-9.2. The Contract added that Folsom's "obligation to indemnify covers all sums for which J. C. Penney [is] held liable." *Id.* at 9.3.

The Contract also included requirements for Folsom's insurance coverage. Article 10 of the Contract provided that

> Contractor shall maintain from and after the Effective Date and until the expiration or termination of this Agreement, commercial general liability or personal liability insurance of at least $1 million per occurrence covering the type of Services performed, or in the amounts required by law, whichever is greater. Such insurance policy shall be procured from an insurance company acceptable to J. C. Penney. Upon J. C. Penney's request, Contractor shall provide J. C. Penney with a certificate of Insurance evidencing the requested coverage concurrently with the execution of this Agreement and upon each renewal of such policy thereafter. This section shall in no way affect the indemnification remedy or warranty provisions set forth in this Agreement.

*Id.* at Art. 10. At some point, "Folsom provided J. C. Penney a certificate of insurance indicating that J. C. Penney was named as an additional insured." *Id.* at 8; *see also* Certificate, Ex. 2 to Penney's L.R. 56(a)(2) Stmt., ECF No. 51-3.

Ms. Laura Briggs, who was the Office Manager for Folsom from 2006 until it closed for business in December 2014, requested a certificate listing J. C. Penney as an additional insured party. J. C. Penney's L.R. 56(a)(2) Stmt. ¶ 9; *see also* Briggs Dep., Ex. 2 to Penney's L.R.

3

56(a)(2) Stmt., ECF No. 51-2, 84: 12-14). Ms. Briggs said that J. C. Penney "required . . . Folsom to request from its agent that J. C. Penney and its subsidiaries and affiliates be listed as additional insureds on this insurance policy." *Id.* at 84:1-12; *see also id.* at 85: 8-11 ("Q: And J. C. Penney required this as the condition before you could begin work as a contractor? A: The condition of the contract, yes."). Ms. Briggs did not recall whether J. C. Penney was, in fact, listed as an additional insured on Folsom's insurance policies. *Id.* at 85:19-23. While she did not recall any "communications" with Folsom's insurance agent asking to add J. C. Penney to Folsom's insurance, she stated that it was "very typical to name a customer as an additional insured." *Id.* at 86:1-8.

In its third-party Complaint, J. C. Penney alleges that it "tendered the defense and indemnification of First-Party Plaintiff Ralph Seitz's Complaint to Folsom's insurer in accordance with the information on the Certificate of Insurance. Folsom's insurer denied additional insured coverage on the basis that J. C. Penney Corporation, Inc. and its affiliates, including J. C. Penney Properties, Inc., were not, in fact, named as additional insureds in Folsom's insurance policy." Compl. ¶ 9. Folsom did not dispute this contention. *See* Ans. to Third-Party Compl., ECF No. 34, 9 ("leaving third party plaintiffs to their proof" as to the allegations in paragraph nine).

Mr. Seitz claims that he incurred the relevant injuries when he fell in the parking lot of the Facility, which is designated as Lot 1. Folsom Stmt. ¶ 4. At the time of the incident, J. C. Penney owned the facility. *Id.* at ¶ 4. Robert Gardner was "Maintenance Senior Manger" of the Facility. Gardner Dep., Ex. 1 to J. C. Penney Stmt., ECF No. 49-1. At the time of the incident, Mr. Gardner was "responsible for the [F]acility and the grounds" and managed a "crew of maintenance workers." *Id.* at 7:1-11. J. C. Penney asked Mr. Gardner and his team to "inspect[]

the entire property" at various points, although they did not make routine inspections." *Id.* at 21:13-18.

According to Mr. Gardner, he and his maintenance team "did small scale [snow removal] assistance" to "make a safe environment for all parties involved." *Id.* at 19:3-24. "Folsom had the contract for the snow removal by and large," if he or his team "saw something [they] wanted to do that needed attention, [that they] could handle with a pickup truck, [they] would do that." *Id.* at 19: 14-17. The Contract between Folsom and J. C. Penney provided that Folsom should clear the lots in the Facility by 5:00 a.m. and were obligated to begin plowing the parking lots whenever more than two inches of snow had accumulated. *See* Contract, Sched. A, Art. 5. Mr. Gardner stated that he "didn't follow" this provision of the Contract, however, and in reality "would have [Folsom] come out well before two inches." *Id.* at 27:9-10. If J. C. Penney wanted Folsom to come to the yard, Mr. Gardner or one of the supervisors that he employed would call Folsom. *Id.* at 27:23-24 ("The call from J. C. Penney could come from me or from my two supervisors"). Ms. Briggs explained that "Folsom wouldn't have begun [snow removal] activities without" a call from J. C. Penney. Briggs Dep., 45:7-11.

Generally, Folsom cleared "parking lots and roadways," and J. C. Penney cleared the sidewalks at the Facility. *Id.* at 30: 6-8. According to Mr. Gardner, J. C. Penney helped Folsom "understand the priorities," for snow removal, but the contractor "use[d] his expertise in how to best provide snow removal" and determined details like "how to use a truck, how to operate [a] loader, how to fill [a] salt truck" without J. C. Penney's intervention. *Id.* at 45:1-9. Specifically, J. C. Penney would pass along information about the truck schedules at the Facility or other "business priorities," but Folsom generally "kn[ew] that his obligation [wa]s to provide snow removal for the entire property." *Id.* at 46:2-13. J. C. Penney did not "granulate [the snow

5

removal priorities] down to a list of the seven lots and this is the order you do them in," because "things happen[ed] simultaneously based on multiple equipment." *Id.* at 46;22-24; 47:9-10. Mr. Gardner did agree that there was "a potential" that, "if the conditions, the snow and the business demands at a particular time of day were such that J. C. Penney wanted Lots 6 and 7 to be given priority, J. C. Penney would tell Folsom that." *Id.* at 47:11-18.

J. C. Penney's weather records indicated that the "snowfall was continuous between 7 a.m. and sometime in the afternoon" on the date of the incident. Gardner Dep. 58: 17-20. Folsom's work logs indicate that a Folsom employee arrived at the Facility at 9:10 a.m. with a salt truck. J. C. Penney Stmt. ¶ 14 (citing Work Logs, Ex. 8 to J. C. Penney's Stmt., ECF No. 49-8, 3). Five additional Folsom employees came to the Facility that day, all of whom, according to the logs, did not leave the Facility until 1:00 a.m. the next morning. *Id.* Mr. Gardner stated that J. C. Penney paid Folsom for services billed on February 18, 2014 and that he had no memory of "any problems" with Folsom's service. *Id.* at 58:8-16.

In January 2016, J. C. filed an amended Answer to Mr. Seitz's Complaint, as well as a third-party Complaint against Folsom. In the third- party complaint, J. C. Penney alleged that Folsom was liable for (1) contractual indemnification, (2) promissory estoppel, and (3) common law indemnification.

## II. Standard of Review

In a motion for summary judgment, the burden is on the moving party to establish that no genuine issues of material fact remain in dispute and that it is thus "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law" and a factual issue is "genuine" if "a reasonable jury could return a

6

verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In reviewing the record, this Court must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citations omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is inappropriate. *See Security Insurance Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004); *Anderson*, 477 U.S. at 250 (summary judgment is proper only when "there can be but one reasonable conclusion as to the verdict"). In determining whether summary judgment is appropriate, the Court must consider only admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence") (citation and internal quotation marks omitted); FED. R. CIV. P. 56(e).

### III. Discussion

#### A. Contractual Indemnification

Folsom objects that J. C. Penney's motion "has been filed prematurely" and must be denied, because an action for contractual indemnification cannot be successfully maintained until the underlying liability has been incurred. Opp. Mem., 3. The Court agrees.

##### 1. Duty to Indemnify

As a general rule, "contractual indemnification claims that are based on written agreements are construed in accordance with the principles of contract law." *Danbury Bldgs.,*

*Inc. v. Union Carbide Corp.*, 963 F.Supp.2d 96, 105 (D. Conn. 2013) (quoting *Lopez v. Chemical Abuse Services*, No. CV075010516S, 2008 WL 2169407, at *2 (Conn. Super. Ct. 2008) (internal quotation marks omitted); *PSE Consulting, Inc. v. Frank Mercedes & Sons, Inc.*, 267 Conn. 279, 290 (2004)). Under this general rule, summary judgment would be appropriate when an indemnification agreement was "unambiguous" and allowed the court to determine the intent of the contracting parties. *Danbury Bldgs.*, 963 F.Supp.2d at 106. "[A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *United Illuminating Co. v. Wisvest–Connecticut, L.L.C.*, 259 Conn. 665, 670–71 (2002).

At the same time, Connecticut courts[2] have held that the court cannot grant a judgment in favor of a party seeking indemnification when the underlying action is still pending. *See, e.g. Allstate Insurance Company v. Tarantino*, No. 3:15-cv-62 (SRU), 2016 WL 3546197 at *3–4 (D. Conn. 2016) ("Because the duty to indemnify in the present case depends on the factual basis upon which judgment, if any, is rendered against [the plaintiff] in the underlying state court case, a ruling on the duty to indemnify is premature at this time."); *Marsh v. Town of East Hartford*, No. 3:16-cv-928 (SRU), 2017 WL 3038305 at *10 (D. Conn. 2017) ("The defendants moved for summary judgment on Marsh's indemnification claim . . . I determined that this issue was premature and that the parties may litigate the applicability of indemnification should there be a

---

[2] The Contract contains a choice of law provision applying Texas law. Federal courts sitting in diversity apply the the choice-of-law provisions of the forum state, including its choice of law rules. *Klaxon Co. v. Stentor*, 313 U.S. 487, 496 (1941); *Forest Park Pictures v. universal Television Network*, 683 F.3d 424, 433 (2d Cir. 2012). "The threshold choice of law question in Connecticut, as it is elsewhere, is whether there is an outcome determinative conflict between the applicable laws of the states with a potential interest in the case. If not, there is no need to perform a choice of law analysis, and the law common to the jurisdictions should be applied. *Lumbermens Mutual Casualty Co. v. Dillon Co*., 9 F. App'x 81, 83 (2d Cir. 2001). No such conflict has been identified by the parties in this matter. *See* J Defs. Mem. in Support, ECF No. 47 at 5-6.

jury award in favor of Marsh."); *see also Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 179–80 (2d Cir. 2005) ("Indemnity provisions by definition only require reimbursement for losses and liabilities that the indemnitee has actually incurred.") (citing *Atlantic Richfield Co. v. Interstate Oil Transp. Co.*, 784 F.2d 106, 112 (2d Cir.1986) ("[A] claim for indemnity . . . requires that an actual liability be sustained by the indemnitee.")).

J. C. Penney cites cases in its reply brief that do not conclusively establish whether a court can grant summary judgment on an indemnification action before judgment has entered in the suit for which it seeks indemnification. *See* Reply at 4 (citing *MMC PPA v. Bridgeport Hospital*, 2015 WL 5174012 (D. Conn. 2015); *Thyberg v. Bonneville*, 1999 WL 639863 (Conn. Super. Ct. 1999)).

In *MMC PPA*, the court held that the third-party plaintiff could bring a claim for indemnification without "wait[ing] until plaintiffs fully litigate their claims before it may bring an indemnification action," but did not address whether a court could enter a judgment as to indemnification before the resolution of the underlying suit. *MMC PPA*, 2015 WL 5174012 at *6 (noting when interpreting the statute of limitations for indemnification actions that the legislature did not intend "to bar a party from impleading a potentially liable defendant into the original action [and] specifically recognized that in most instances an indemnification action would run simultaneously with the underlying claim."). Similarly, in *Thyberg*, the Superior Court denied a motion to strike a counterclaim for indemnification, noting that while "a contract for loss generally accrues at the time of loss, pronouncing that [the counterclaimant] cannot bring its [indemnity action] until a final judgment in the underlying action is rendered against it would only serve to thwart the purposes" of the indemnification statute. *Thyberg v. Bonneville*, 1999 WL 639863, at *4 (Conn. Super. Ct. 1999). In short, these cases address when a party can bring

9

an indemnification action, not whether the action can be resolved before the resolution of the underlying action.

Timing issues aside, the Court could not grant summary judgment on the contractual indemnification claim because the claim's resolution depends on genuine issues of material fact that remain unresolved. In *Burkle*, which J. C. Penney cites, the court granted summary judgment based on an indemnification provision in which the "lessee agree[d] to indemnify and hold [l]essor harmless from any and all liability, loss, costs, damages and expenses . . . caused by or arising from ownership, use, operation . . . of one or more automobiles leased hereunder." *Burkle v. Car & Truck Leasing Co.*, 1 Conn. App. 54 (Conn. App. 1983); *see also Braunfeld v. Chase Manhattan Bank of Connecticut*, 1998 WL 779634, at *5 (Conn. Super. Ct. 1998) (allowing third party defendant to file a motion for summary judgment as to liability only on the first count of the cross claim on the basis that there existed no genuine issue of material fact and it was entitled to judgment as a matter of law pursuant to the lease agreement, which "unequivocally state[d] that Chase agree[d] to defend and indemnify Fleet from any liability for injury or damage to persons occurring upon the sidewalks abutting the premises.").

Unlike *Burkle* and *Braunfeld*, in which the indemnity clause by its terms applied to all claims relating to a particular location or automobile, the Contract provides for indemnification for "any and all claims [that] arise out of, relate to, or are caused by Contractor's performance or non-performance of this Agreement." Contract, Art. 9. To determine whether the agreement applies to this case, the Court would have to determine the cause of Mr. Seitz's accident.

Because the cause of Mr. Seitz's accident is disputed, the Court is unable to grant summary judgment on the indemnification claim.[3]

### 2. Duty to Defend

As addressed above, the Contract required Folsom to provide J. C. Penney a defense and indemnity for "any and all claims arising out of or related to Folsom's clean-up activities." Contract, Art. 9. By the terms of the Contract, Folsom "will retain and pay reputable counsel, approved by JCPenney, to represent JCPenney and all current and former directors, officers, agents, employees an affiliates named as parties to the legal proceedings." *Id.*

J. C. Penney argues that they are entitled to summary judgment on Folsom's duty to defend under the contract because the duty to defend is (a) broader than the duty to indemnify and (b) the duty is triggered when "the allegations of the complaint . . . only potentially bring the claim within coverage . . . . " Defs. Mem. in Support, ECF No. 47. Therefore they argue that the duty to defend claim is ripe and they are entitled to summary judgment. Folsom does not respond specifically to J. C. Penney's arguments, instead arguing broadly that "any claim for defense and/or indemnification has not yet been triggered." Opp. Mem., 4.

It is true that, within the insurance context, Connecticut courts generally treat the duty to defend different from the duty to indemnify. Connecticut courts have "consistently held that the duty to defend is broader than the duty to indemnify" and "triggered if at least one allegation of the complaint 'falls even *possibly* within the coverage.'" *Capstone Bldg. Corp. v. Am. Motorists Insurance Co.*, 308 Conn. 760, 805 (Conn. 2013) (emphasis in original; internal citations and

---

[3] *Accord Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 821 (Tex. 1997) ("The duty to indemnify is triggered by the actual facts establishing liability in the underlying suit.")

11

quotations omitted). *See also English v. BGP International, Inc.,* 174 S.W.3d 366, 372 (Tx. App. 2005) (drawing distinction between duties to defend and indemnify).

J. C. Penney, however, did not seek a declaratory judgment as to Folsom's duty to defend and the company has not alleged that it looked to Folsom to "retain and pay reputable counsel." Contract, Art. 9. Instead, J. C. Penney's claims primarily seek indemnification of the costs of the litigation. This issue, therefore, will be most efficiently addressed once the underlying matter is addressed: that is, like the broader identification claim, it will be more efficient and expedient to address the duty to defend, and any attorney's fees Folsom might owe as a result, when the underlying issues of liability and the broader contractual indemnification question are addressed. *See Deitz v. Bouldin*, 136 S. Ct. 1885, 1892 (2016) (recognizing the Court's inherent authority to manage its docket with "a view toward efficient and expedient resolution of cases.").

### B. Promissory Estoppel

Folsom argues that it is entitled to summary judgment on Count Two of the third-party Complaint, for promissory estoppel, because "Folsom did not promise to name J. C. Penney as an additional insured," and J. C. Penney's claim therefore fails as a matter of law. Folsom Mem. at 4. J. C. Penney agrees that the Contract did not require J. C. Penney to be named as an additional insured, but argues that Folsom made a collateral promise to name J. C. Penney as an additional insured, creating a triable issue of fact that preserves its promissory estoppel claim. Penney's Opp. Mem., ECF No. 50 at 4. The Court agrees with J. C. Penney.

In order to prevail on a claim for promissory estoppel, a plaintiff must establish 1) a clear and definite promise, 2) a change in position in reliance on the promise, and 3) resulting injury. *See D'Ulisse–Cupo v. Bd. of Directors of Notre Dame High School*, 520 A .2d 217, 221 (Conn.

1987). The promise must be sufficiently clear and definite such that the promisor could reasonably expect to induce reliance. *See id.* at 221.

When the promises underlying a promissory estoppel claim "contradict promises within [a] written contract" between the parties, the plaintiff may not bring a promissory estoppel claim. *Hood v. Aerotek, Inc.*, No. 3:98-cv-1524 (CFD), 2002 WL 294762, at *5 (D. Conn. 2002). "Allowing promissory estoppel when the alleged promise contradicts a promise located in an integrated agreement would provide an end-run around the parol evidence rule." *Id.*; *see also Security Plans, Inc. v. CUNA Mutual. Insurance Society*, 769 F.3d 807, 816 (2d Cir. 2014) ("As a general matter, a party may not maintain a promissory estoppel claim where the promises on which the claim is based are expressly contradicted by a later written agreement covering the same subject matter") (interpreting New York law) (internal citations omitted); *Lombardi v. Marketing Corp. of America*, No. CV91 0293281, 1994 WL 247956, at *5 (Conn. Super. Ct. 1994) ("An untenable situation would result if notwithstanding the existence of a written, enforceable contract, a party could sue for promissory estoppel based on contradictory promises that it allegedly relied on."); *see also Lark v. Post Newsweek Stations Connecticut, Inc*., 1995 WL 491290, at *3 (Conn. Super. Ct. 1995) ("A party does not have a cause of action for promissory estoppel where an existing contract exists is alleged and appears to be enforceable.").

J. C. Penney argues that Folsom's promise to add J. C. Penney to its insurance was a "collateral promise" that was not reflected in the Contract. Opp. Mem. at 4. J. C. Penney further argues that evidence of this promise is admissible to prove its promissory estoppel claim, despite the Contract's merger clause. "Ordinarily, a merger clause provision indicates that the subject agreement is completely integrated, and parol evidence is precluded from altering or interpreting the agreement." *Weiss v. Smulders*, 313 Conn. 227, 248 (Conn. 2014) (citing *Tempo Shain Corp.*

13

*v. Bertek,* Inc., 120 F.3d 16, 21 (2d Cir.1997)). "[S]uch evidence may still be admissible," however, if it is relevant "to prove . . . a collateral oral agreement which does not vary the terms of the writing." *Id.* at 249.

In *Weiss*, the Connecticut Supreme Court held that a specialty food company and its owner could bring a promissory-estoppel claim against another company for failing to form a joint venture with the plaintiffs after promising to do so. *Id.* at 250. The court held that the parol evidence rule did not bar the trial court's admission of evidence to prove that defendants had promised to the form a joint venture, because, even if the parties' distribution agreement was fully integrated, the alleged oral promise to form a joint venture was collateral to the subject matter of the agreement and did not vary or contradict its terms. There was, in fact, "no provision in the distribution agreement addressing the parameters [of the joint venture]," and the title of the agreement—"Master Distributorship Agreement"—confirmed that it "merely pertained to the distribution relationship," rather than the joint venture. *Id.* at 251.

In this case, J. C. Penney seeks to hold Folsom liable for a "collateral promise," to add J. C. Penney to its insurance contract. *Weiss*, 313 Conn. at 248. Ms. Briggs, Folsom's Office Manager, stated that J. C. Penney "required . . . Folsom to request from its agent that J. C. Penney and its subsidiaries and affiliates be listed as additional insureds on this insurance policy," Briggs Dep., 84:1-12, and added that Folsom's addition of J. C. Penney was a "condition" for Folsom's "work as a contractor," *id.* at 85: 8-11. While the Contract did not require Folsom to include J. C. Penney on its policy, only stating that Folsom must "procure [an insurance policy] from a company acceptable to J. C. Penney," it also did not specifically absolve Folsom of the obligation to add J. C. Penney on the policy. *See Moore v. Ferris Builders*, 2008 WL 4308095, at *7 (Conn. Super. Ct. 2008) (plaintiff could bring an action for promissory

14

estoppel against contractor who had promised that the basement would be dry when the contract "has no reference to a dry basement but does not exclude it."). J. C. Penney's alleged promise does not "contradict[] a promise located in an integrated agreement," *Hood*, 2002 WL 294762 at *5, and recovery on its promissory estoppel claim does not circumvent the parol evidence rule or the merger clause.

Furthermore, J. C. Penney alleges that Folsom, by showing it a Certificate of Insurance listing J. C. Penney as the holder of the Certificate, induced its reasonable reliance on the existence of liability insurance. The Connecticut Superior Court has recognized "the established custom in the construction industry of reliance on certificates of insurance." *Hobbs, Inc. v. Charter Oak Fire Ins. Co.*, 2014 WL 1876898, at *3 (Conn. Super. Ct. 2014). The court in *Hobbs* also recognized that "a plethora of cases from other jurisdictions" that hold that "a certificate of insurance may be relied upon as to the existence of an insurance policy," although "it confers no rights upon the holder" against the insurance company. *Id.* at *8; *see also Ensign Yachts, Inc. v. Arrigoni*, No. 3:09-cv-209 (VLB), 2010 WL 2976927, at *4–5 (D. Conn. 2010) (plaintiff had stated a misrepresentation claim under CUTPA by alleging that the defendant "intimat[ed] that [the plaintiff's] predecessor . . . was the policy holder in the Certificate of Liability Insurance which they knew was going to be presented to [the plaintiff]," after which the plaintiff reasonably relied and "suffered pecuniary harm as a result of not being covered by the contract.").

In any event, these issues are triable issues of fact, not appropriate for resolution on a motion for summary judgment.

15

### C. Common Law Indemnification

In Count Three, for common law indemnification, J. C. Penney asserts that if Seitz was injured, it was due to the active and primary negligence of Folsom, because Folsom had exclusive control of the area where Seitz fell and J. C. Penney did not know, nor should it have expected, that Folsom would be negligent. *See* Compl. p. 7. Folsom argues that summary judgment should be granted because "J. C. Penney cannot establish an essential element of its common law indemnification claim: exclusive control." Folsom Mot. Summ. J., ECF 43-1, 6.

The common-law doctrine of indemnification "permits a tortfeasor to assert a claim . . . against another liable tortfeasor." *Crotta v. Home Depot, Inc.*, 249 Conn. 634, 641-42 (Conn. 1999) (emphasis omitted). Common-law indemnity is appropriate where (1) the third-party defendant was negligent; (2) the third-party defendant's negligence, rather than defendants' negligence, was the direct, immediate cause of the accident and injuries; (3) the third-party defendant was in control of the situation to the exclusion of the defendant; and (4) the defendant did not know of third-party defendant's negligence, had no reason to anticipate it, and could reasonably rely on third-party defendant not to be negligent. *Skuzinski v. Bouchard Fuels, Inc.*, 240 Conn. 694, 698 (1997).

Folsom specifically argues that J. C. Penney "cannot prove that Folsom had exclusive control" over the lot in question because J. C. Penney's employee, Robert Gardner, testified that he and his maintenance team sometimes worked at the lot. *Id.* J. C. Penney argues that Folsom controlled "the situation"—that is, the "dangerous condition" that gave rise to Mr. Seitz's accident—so that exclusive control is still possible. Penney Opp. Mem., ECF No. 50, 6. Because "there is no evidence that J. C. Penney participated in—let alone controlled—any of the snow

and ice removal in the parking lots," Penney argues, there remains a genuine issue of material fact concerning Folsom's liability for Count Three of the Third-Party Complaint. Id.

"Exclusive control of the situation" refers to control "over the dangerous condition that gives rise to the accident." *Skuzinski*, 240 Conn. at 706; *see also Pouliot v. Paul Arpin Van Lines, Inc*., 367 F.Supp.2d 267, 271–72 (D. Conn. 2005) ("The relevant 'dangerous condition' is Pouliot's use of an allegedly defective truck and liftgate."). "Ordinarily," the "absence or presence of exclusive control is a question of fact." *Id.* at 704-05 (noting that in "rare" circumstances, exclusive control "may properly be decided as a question of law"). The indemnitee must show that the indemnitor "was in control of the situation at the time of the accident to the exclusion of the plaintiffs." *Kaplan v. Merberg Wrecking Corp*., 152 Conn. 405, 418 (Conn. 1965).

In *Skuzinski*, the Supreme Court approved of the trial court's decision to strike the third-party complaint because "no reasonable juror could find that the defendants had exclusive control over the situation." *Id.* at 706. The court held that the snow and ice in the adjoining public roadway gave rise to the plaintiff's accident was, and concluded, based on the undisputed allegations, that no reasonable juror could find that the third-party defendant had exclusive control over the accident because the plaintiff's injuries were caused by an unrelated party and occurred in an adjoining public roadway. *Id.*

Similarly, in *Castillo*, the Superior Court denied the third-party defendant's motion for summary judgment on an indemnification claim because an issue of fact remained as to whether the third-party defendant, a snow removal contractor, had exclusive control over the snow and ice at the third-party plaintiff's property. *Castillo v. World Gym East of Branford*, Inc., 2013 WL 4872553, at *4 (Conn. Super. Ct. 2013). The contractor argued that it did not have exclusive

17

control because the third-party plaintiff at times performed snow removal on its own. *Id.* The court reviewed the deposition testimony of an employee of the third-party plaintiff, who said that the plaintiff kept salt and shovels on hand to do snow removal and stated that "if we are aware of an area that needs to be shoveled or sanded . . . then we would do it." *Id.* This testimony did not necessarily disprove exclusive control, the court reasoned, because "the statement does not purport to show that the third-party plaintiffs actually removed any snow or ice on the day that the plaintiff fell," or that they "ever removed any snow or ice on the property." *Id.*

Folsom argues that it did not retain exclusive control over the lot in which Mr. Seitz fell because J. C. Penney owned the lot and asked its employees to inspect it and, at times, assist in snow removal. Folsom Mem., ECF NO. 43-1 at 6. J. C. Penney responds that "there is no evidence that J. C. Penney participated in—let alone controlled—any of the snow and ice removal in the parking lots on February 18, 2014, the date at issue," and emphasizes that it "relied on Folsom's expertise" in snow removal, despite having the capability to remove snow itself. Opp. Mem. at 9. The record indicates that, while J. C. Penney employees at times cleared snow from the parking lots in the Facility, it generally relied on Folsom's "expertise in how to best provide snow removal" in the lots. Gardner Dep. 45:1-9. The record reveals that Folsom employees had been working at the Facility for several hours by the time Mr. Seitz arrived at the Facility for his lunch break.

While the record indicates that Mr. Gardner and his staff occasionally helped remove snow from the facility and followed Folsom's snow removal priorities, it does not reveal whether anyone from J. C. Penney was so involved on the date of the accident. There remains, therefore, a possibility that Folsom was in the middle of removing the snow and ice from Lot One of the Facility when Mr. Seitz fell, and was therefore in exclusive control over the "dangerous

18

condition that gives rise to the accident." *Skuzinski*, 240 Conn. at 694. Furthermore, because it is unclear whether Mr. Seitz fell on freshly fallen snow or ice that accumulated from a prior storm, the Court cannot determine the parameters of the "relevant dangerous condition," *Pouliot*, 367 F.Supp.2d at 271, it cannot properly assess the question of exclusive control. The Court must deny Folsom's motion for summary judgment on Count Three of the third-party Complaint.

## IV. Conclusion

Both motions for summary judgment on J. C. Penney's third-party Complaint are **DENIED**.

SO ORDERED at Bridgeport, Connecticut this, the 28th day of September, 2017.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE